UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| QUENTIN L. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02413-JPH-MPB |
| | ) | |
| DUSHAN ZATECKY, | ) | |
| WEXFORD OF INDIANA, LLC., | ) | |
| ROBERT E. CARTER, JR., | ) | |
| CHRISTINA REAGLE, | ) | |
| AARON SMITH, | ) | |
| MASON, | ) | |
| RINEHART, | ) | |
| RATTIN, | ) | |
| DAVIS, | ) | |
| EARNEST, | ) | |
| GREY, | ) | |
| CARTER, | ) | |
| GROSS, | ) | |
| LAMAR, | ) | |
| GREY, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

This case arises from events that occurred while Quentin Taylor was

housed in segregation at Pendleton Correctional Facility from December 28,

2019, to January 16, 2020. Mr. Taylor brings claims based on the Eighth

Amendment, First Amendment, and Rehabilitation Act. Dkt. 8; dkt. 18.

Defendants have filed motions for summary judgment on all claims. Dkts. [124],

[127]. For the reasons that follow, their motions are **granted in part** and **denied**

**in part**.

# I.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that

2

there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.
## Factual Background

In adjudicating Defendants' motions for summary judgment, the Court considers Mr. Taylor's 59-page verified complaint as evidence only to the extent that it is properly cited in his response to Defendants' summary judgment motions. *See* S.D. Ind. L.R. 56-1(h); dkts. 126, 129 (notifying Mr. Taylor of S.D. Ind. L.R. 56-1). *See also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (the Court is only required to consider the materials cited by the parties and is not required to "scour every inch of the record" for evidence that is potentially relevant). The Court also considers as evidence citations to Mr. Taylor's verified "statement of material facts not in dispute" (dkt. 136 at 4–25) and his verified summary-judgment response brief (dkt. 137) to the extent that they do not contradict his deposition testimony and are otherwise admissible. *See Jones v. Van Lanen*, 27 F.4th 1280, 1285–86 (7th Cir. 2022) (verified pleading may be treated as an affidavit in the context of evaluating a summary judgment motion); *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("[T]he sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.").

3

## A. The Parties

At all times relevant to this case, Mr. Taylor was an IDOC inmate housed at Pendleton Correctional Facility. Taylor Deposition, Dkt. 127-1 at 13.[1]

The defendants can be divided into two groups—the State Defendants (Dushan Zatecky, now-former IDOC Commissioner Robert E. Carter, current IDOC Commissioner Christina Reagle,[2] Aaron Smith, Captain Davis Mason, Captain Charles Rinehart, Captain Jeremy Rattan, Lieutenant Justin Davis, Lieutenant Jason Ernest, Officer Leslie Gray, Officer Nicole Carter, and Officer Rachael Gross) and the Medical Defendants (Dr. Akilah LaMar, Dr. Michael Gray, and Wexford of Indiana, LLC).[3]

At all times relevant to this case, Wexford was a private contractor that provided health care services to the IDOC, *id.* at 92–93; Dr. Akilah LaMar was employed by Wexford as a psychologist at Pendleton, LaMar Affidavit, Dkt. 124-3 ¶¶ 2–3, 5; and Dr. Michael Gray was employed by Wexford as a psychologist at Pendleton, Gray Affidavit, Dkt. 124-2 ¶¶ 2, 4–6. As psychologists, Dr. LaMar

---

[1] Citations to Mr. Taylor's deposition are to the page numbers assigned when the document was filed in CM/ECF.

[2] At screening, Mr. Taylor was allowed to proceed with an official-capacity Rehabilitation Act claim against Commissioner Carter. The Court takes judicial notice that, later, Commissioner Reagle became the new commissioner of the IDOC. *See* https://www.wfyi.org/news/articles/indiana-department-of-correction-leader-stepping-down-to-join-lobbying-firm (last visited March 28, 2023). When a public officer sued in an official capacity ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party. Fed. R. Civ. P. 25(d). Thus, the **clerk is directed** to add Commissioner Reagle, in her official capacity, as a defendant on the docket.

[3] The **clerk is directed** to update the docket to reflect the proper names of the defendants as reflected in this paragraph.

and Dr. Gray were not responsible for housing classification and placement, which are decisions made by custody staff. Dkt. 124-3 ¶ 8; dkt. 124-2 ¶ 8. Likewise, as psychologists, they do not have the authority to prescribe medications. Dkt. 124-3 ¶ 12; dkt. 124-2 ¶ 7.

Also at all times relevant to this case, Robert Carter was the IDOC Commissioner. State Defendants' Answer, Dkt. 41 at 1. The Court takes judicial notice that he has since been replaced by Christina Reagle. *See supra* n.2. Dushan Zatecky was the Warden of Pendleton. Zatecky Declaration, Dkt. 127-2 ¶ 3. The remaining defendants were employees at Pendleton. Dkt. 41 at 2.

### B. Events Leading Up to Mr. Taylor's Placement in the D.O. Building

At some point while in IDOC custody, Mr. Taylor was diagnosed with depression, PTSD, antisocial personality disorder, and anxiety. Dkt. 124-1 at 54.

On December 28, 2019, Mr. Taylor had an altercation with Correctional Officer Carlos Rosales. *Id.* at 20–21. During the altercation, Mr. Taylor took Officer Rosales's pepper spray and sprayed Officer Rosales with it. *Id.* at 21. After this incident with Officer Rosales, Mr. Taylor ran outside to the porch, at which point he surrendered to other correctional officers. *Id.* at 22. During the altercation, Officer Rosales fell into a water fountain and sustained a puncture wound to his kidney area. *Id.*; dkt. 127-2 ¶ 4. Officer Rosales was taken by ambulance from the scene for treatment. Dkt. 127-2 ¶ 4.

After the altercation, Mr. Taylor was taken to the medical department, where he was placed in a holding cell. Dkt. 124-1 at 23. He was taken to G Cell House for a short period but then moved to the "D.O. Building." *Id.*

5

The D.O. Building consists of six holding cells and several offices. Dkt. 127-2 ¶ 5. Inmates are housed in the holding cells in the D.O. Building when there is a security issue that prevents their placement in another location, such as suicide watch, a hunger strike, holds while a restrictive housing cell is being prepared, or temporary holds when an inmate is pending transport. *Id.* ¶ 6. Under IDOC policy, when an inmate assaults a staff member the inmate is transferred to another IDOC facility. *Id.* ¶ 7. Because Mr. Taylor assaulted Officer Rosales, he was housed in a holding cell in the D.O. Building pending transfer to another IDOC facility. *Id.* ¶ 8.

### C. Events Leading Up to Suicide Attempt

About two hours after the altercation with Officer Rosales, Mr. Taylor was placed in a holding cell in the D.O. Building. Dkt. 124-1 at 23–24. The cell did not have a bed area, a sink, or a toilet. *Id.* at 25. Mr. Taylor was kept in the holding cell from about 7:00 a.m. until about 4:00 or 5:00 p.m. the same day. *Id.* During that time, Mr. Taylor asked Captain Mason if he could use the restroom. *Id.* at 27. Captain Mason denied the request, so Mr. Taylor had to urinate on the floor. *Id.* Mr. Taylor told Captain Mason what happened, and Captain Mason moved him to another cell while the first cell was cleaned. *Id.* at 28.

The new cell was also a holding cell, but it had a working toilet, a working sink, and a sleeping area on the floor. *Id.* at 29. Mr. Taylor was housed in this cell from December 28 to December 30, 2019. *Id.*

### D. Suicide Attempt and Placement on Suicide Watch

On December 30, 2019, Mr. Taylor attempted suicide by hanging himself in his cell. *Id.* at 31. Mr. Taylor injured his head and shoulder as a result of the suicide attempt. *Id.* at 32–33. Before the attempt, he did not tell anyone that he was having suicidal thoughts. *Id.* at 31, 63.

After Mr. Taylor was discovered, he was walked to the medical department, where he was seen by two nurses. *Id.* at 32. Mr. Taylor was then placed in a "dry" holding cell—a cell without a sink or toilet—in the D.O. Building. *Id.* at 76. He remained in that cell from about 6:00 a.m. to 7:00 p.m. on December 30, 2019. *Id.* at 67. Mr. Taylor was denied water and access to a restroom, so he urinated and defecated on the floor of the dry cell. *Id.* at 77; dkt. 136 at 9.

Later that day, Dr. LaMar saw Mr. Taylor and placed him on suicide watch. Dkt. 124-1 at 33–34, 63; dkt. 124-4 at 11. During the conversation, Mr. Taylor reported that he was being subjected to cruel conditions because he was being kept in a holding cell with no toilet or sink and had already defecated on the floor. Dkt. 124-1 at 64–65. He also reported that he had not had a shower or been given any hygiene products for about three or four days. *Id.* at 80; dkt. 136 at 11.

At the time Mr. Taylor was placed on suicide watch, he had not been evaluated by a psychiatrist and no referral had been placed, so psychiatric medications were not provided. Dkt. 124-3 ¶ 11. Mr. Taylor's medical records reflect that Dr. LaMar directed the following conditions while Mr. Taylor was on suicide watch: (1) Mr. Taylor could have monitored showers and could use the

toilet without monitoring; (2) Mr. Taylor could have a suicide blanket, suicide kimono, and mattress; (3) Mr. Taylor could have meals but no utensils; (4) Mr. Taylor's cell would be stripped of personal items; and (5) Mr. Taylor would be placed on close observation. Dkt. 124-4 at 11.

Mr. Taylor remained on suicide watch from December 30, 2019, to January 6 or 7, 2020. Dkt. 124-1 at 37. About six to eight hours after Mr. Taylor saw Dr. LaMar, Lieutenant Ernest moved him to a "wet" holding cell in the D.O. Building—that is, a cell with a toilet and a sink. *Id.*; dkt. 136 at 10. He remained in that wet cell until he was transferred to another correctional facility on January 16, 2020. Dkt. 124-1 at 43. Inmates who are placed on suicide watch at Pendleton are housed in different areas, including the HRU and the D.O. Building. *Id.* at 42; dkt. 124-2 ¶ 9.

### E. Contact with Mental Health Staff During Suicide Watch

While Mr. Taylor was on suicide watch, mental-health staff checked on him each weekday. Dkt. 124-1 at 81.

Dr. LaMar spoke with Mr. Taylor again on December 31, 2019, and recommended that he remain on the same level of suicide observation. Dkt. 124-4 at 20–24. During the meeting, Mr. Taylor reported that officers were leaving doors open to "freeze him" and that he had not had a shower in several days. *Id.* at 20.

On January 2, 2020, Dr. LaMar saw Mr. Taylor again and recommended that he remain on suicide watch and close observation. *Id.* at 26–27. Mr. Taylor reported that he had showered but was not provided clean clothes. *Id.* at 26.

On January 3, Dr. LaMar saw Mr. Taylor again and recommended that he remain on suicide watch and close observation. *Id.* at 28–30. At this visit, Mr. Taylor reported that he believed the water in his cell was being turned on and off and that he had not had a shower in several days. *Id.* Dr. LaMar raised these issues with custody staff, who reported that Mr. Taylor had been brought water multiple times and had been offered a shower. *Id.*

On January 6, Mr. Taylor reported to Dr. LaMar that he was ready to come off suicide watch, stating that he did not have any current thoughts of self-harm, suicidal ideation, or homicidal ideation. *Id.* at 37. Dr. LaMar removed him from suicide watch and close observation. *Id.* Later that day, Dr. LaMar saw Mr. Taylor again because custody staff told her that Mr. Taylor said he was suicidal. *Id.* at 40. Mr. Taylor told her that he was not suicidal and that he had only said that so that he could "speak with mental health." *Id.*

Mr. Taylor testified that he reported being suicidal to mental health staff from December 30, 2019, to January 6, 2020. Dkt. 124-1 at 81–82. Dr. LaMar ensured he had a suicide companion while he was on suicide watch. *Id.* at 82. He told Dr. LaMar that he was being denied recreation and access to incoming and outgoing mail. *Id.* at 68. He asked Dr. LaMar for out-of-cell meetings but never received any. *Id.* at 68–69. He felt that it was difficult to communicate with Dr. LaMar while he was in his cell because other people were nearby. *Id.* at 71. Being on suicide watch helped him, but he still believes that his treatment was inadequate because he could not work on his issues when he was limited to in-

cell meetings, he was not "really given any treatment" on suicide watch, and he had to do his suicide watch in a holding cell. *Id.* at 63–64.

**F. Events Leading to January 14, 2020, Self-Harm Incident**

After Mr. Taylor was released from suicide watch, he asked Captain Mason, Captain Rinehart, and Officer Gross for recreation or out-of-cell time. Dkt. 136 at 12.

On January 7, Dr. Gray saw Mr. Taylor after custody staff told him Mr. Taylor was expressing suicidal ideation and had requested a mental health evaluation. Dkt. 124-4 at 42–43. During the meeting, Mr. Taylor reported that custody staff were conspiring against him and that he had not expressed suicidal ideation. *Id.* at 43. He denied any current intent to harm himself, others, or property. *Id.* He did, however, complain that he did not have a pen, which he needed so that he could appeal a disciplinary sanction that had been entered against him. *Id.* Dr. Gray told custody staff about this concern, and they said that they would allow Mr. Taylor access to a flex pen so that he could complete his appeal form. *Id.*

Later that day, Mr. Taylor saw Dr. LaMar for a 24-hour suicide watch follow-up appointment. *Id.* at 45–46. He did not communicate any current thoughts of self-harm, suicidal ideation, or homicidal ideation. *Id.* at 46. He stated that he had received the Bible he had requested but expressed frustration about his continuing placement in the D.O. Building. *Id.*

Mr. Taylor saw Dr. LaMar again on January 13 for a one-week suicide watch follow-up appointment. *Id.* at 48–50. Mr. Taylor reported that he felt he

10

was being held in the D.O. Building unjustly and complained that he was only let out of his cell to shower. *Id.* at 49. He complained that he had not had any recreation time and had not been able to contact his family. *Id.*

At some point, Mr. Taylor was allowed to shower and was given a hygiene bag with two razors in it. Dkt. 124-1 at 85–86. Mr. Taylor brought the hygiene items back to his cell. *Id.* at 86.

On January 14, Mr. Taylor saw Dr. Gray. *Id.* Mr. Taylor told Dr. Gray that he had a razor and planned to use it to cut his own throat. Dkt. 136 at 20. Dr. Gray asked him where the razor was, but Mr. Taylor did not give Dr. Gray the razor. Dkt. 124-1 at 86. He said that he planned to keep the razor for protection against correctional officers. *Id.* at 87. Dr. Gray did not place Mr. Taylor on suicide watch, but he told custody staff that Mr. Taylor had a weapon in his cell and was told that Mr. Taylor's cell would be searched. Dkt. 124-2 ¶ 16. Custody staff did not inform Dr. Gray that a weapon was found in Mr. Taylor's cell or that Mr. Taylor continued to express suicidal ideation or intent or a plan to harm himself. *Id.* ¶ 17.

Several hours after Mr. Taylor saw Dr. Gray, Mr. Taylor cut his arm with the razor. Dkt. 124-1 at 90. When asked whether he had attempted to commit suicide, Mr. Taylor testified, "I just really—I just had self-harm. I just was cutting myself." *Id.* at 102. Mr. Taylor also had a psychotic episode, began dropping feces on the ground, and wrote "Help Me!" and drew a cross in feces on the wall. Dkt. 136 at 22. Captain Rattan, Lieutenant Ernest, and Officer Gray observed this incident. Dkt. 137 at 8. Officer Gray said, "look the dog is playing with his shit"—

or words to that effect. Dkt. 136 at 23. Captain Rattan, Lieutenant Ernest, and Officer Gray took pictures of the cuts on Mr. Taylor's arms and the feces in the cell. *Id.* They had Mr. Taylor's cell cleaned and then placed him back in the cell. *Id.* They did not, however, attempt to get Mr. Taylor medical or mental health assistance, even though Mr. Taylor asked for it. Dkt. 137 at 8.

Mr. Taylor never saw anyone from medical after the incident, and he testified that the cuts on his arm healed on their own, although he did receive alcohol pads to use on the cuts after he was transferred away from Pendleton on January 16. Dkt. 124-1 at 102–03. He also testified that he has scars from the cuts. *Id.* at 56.

### G. Conditions in D.O. Building

While housed in the D.O. Building, Mr. Taylor was not given any recreation or out-of-cell time, except for showers. Dkt. 136 at 13. He was denied incoming and outgoing mail, telephone access, and most personal property. *Id.* At times, Mr. Taylor asked custody staff (including Captain Mason, Officer Carter, Officer Gross, and Lieutenant Davis) to take a shower but was denied permission. *Id.* at 11. At his deposition, Mr. Taylor was not certain when he had showered, dkt. 124-1 at 80, but in his summary-judgment response brief, he complains that, at one point, he was denied a shower and hygiene products for five days, dkt. 137 at 10.

For most of his time in the D.O. Building, he was held in an extremely cold cell. Dkt. 136 at 8, 11. His first holding cell had a broken window. *Id.* at 8. At his deposition, Mr. Taylor also explained that the door to the D.O. Building was left

12

open 24 hours a day during his stay there, even though it was very cold outside, which made it "cold as hell" in his cells. Dkt. 124-1 at 106–07.

From December 30, 2019, to January 16, 2020, Mr. Taylor was housed in the same holding cell in the D.O. Building. *Id.* at 43. His cell had no window or window view. Dkt. 136 at 13. The temperature in the cell was extremely cold. *Id.* at 11. He complained to a shift supervisor, and she brought him some sheets and blankets, but those sheets and blankets were ultimately taken away when he was placed on suicide watch. Dkt. 124-1 at 107.

The toilet in this cell worked, but every few days the sink would have low water pressure, and he could not get drinking water from it. *Id.* at 37–38. Mr. Taylor asked for water, but those requests were sometimes denied, particularly when he asked for water at night. *Id.* at 40–41. He was, however, offered cups of water at mealtimes. *Id.* at 40.

As explained, Mr. Taylor's cells were extremely cold throughout his time in the D.O. Building, in part because the exterior door to the building was kept open at all times. *Id.* at 106–07. The cold was particularly problematic when Mr. Taylor was on suicide watch because, during that time, he did not have proper clothing or blankets to keep warm. Dkt. 136 at 11; dkt. 124-1 at 106 ("I'm on suicide watch. You know, I only get a smock, like a little vest thing and a blanket. It was cold. It was cold as hell."); *see also* dkt. 124-4 at 11 (Dr. LaMar's directions that Mr. Taylor have only a suicide kimono and suicide blanket while on suicide watch); dkt. 124-1 at 107 (Mr. Taylor testifying that extra sheets and blankets were taken away when he was placed on suicide watch).

Throughout his time in the D.O. Building, Mr. Taylor told Dr. LaMar, Captain Mason, Captain Rinehart, Captain Rattan, Officer Gross, Officer Carter, Lieutenant Davis, and Officer Gray that he was feeling overwhelmed by the conditions and that his mental health was worsening because of them. Dkt. 136 at 14.

### H. Transfer to Westville

On January 16, Mr. Taylor was transferred to Westville Correctional Facility. Dkt. 124-4 at 57.

### I. Claims presented

The Court screened Mr. Taylor's complaint, allowing the following claims to proceed: (1) Eighth Amendment claims of deliberate indifference to serious medical needs against Dr. LaMar, Dr. Gray, Captain Rinehart, Lieutenant Ernest, Captain Rattan, and Officer Gray ("Medical-Care Defendants"); (2) Eighth Amendment policy-or-practice claims against Wexford; (3) Eighth Amendment conditions-of-confinement claims against Warden Zatecky, Captain Mason, Officer Carter, Lieutenant Ernest, Officer Gross, Captain Rinehart, Aaron Smith, Captain Rattan, Lieutenant Davis, Officer Gray, Dr. LaMar, and Dr. Gray ("Conditions-of-Confinement Defendants"); (4) related failure-to-train claims against the IDOC Commissioner and Warden Zatecky; (5) First Amendment retaliation claims against Warden Zatecky, Aaron Smith, Captain Mason, Officer Gray, Captain Rattan, and Captain Rinehart ("Retaliation Defendants"); and (6) official-capacity Rehabilitation Act claims against the IDOC Commissioner. Dkt. 8; dkt. 18.

**III.**

**Discussion**

The Court considers Mr. Taylor's surreply, dkt. 156, only with respect to the following issues raised by the Medical Defendants in their reply: (1) Mr. Taylor was relying on inadmissible evidence because he cited to a private settlement agreement and he was not proceeding on a breach-of-contract theory in this case; (2) Mr. Taylor has no medical training and cannot offer opinions about what mental health treatment is appropriate; and (3) Mr. Taylor's response-brief statement that he told Dr. Gray that he had a razor and would slice his own throat violates the "sham affidavit" rule. Dkt. 145. The Court otherwise disregards the surreply because it goes beyond the scope authorized by Local Rule 56-1. *See* S.D. Ind. L.R. 56-1(d) (if a surreply is allowed, it "must be limited to the new evidence and objections.").

**A. Retaliation Claims**

Mr. Taylor brings First Amendment retaliation claims against Warden Zatecky, Aaron Smith, Captain Mason, Officer Gray, Captain Rattan, and Captain Rinehart. A First Amendment retaliation claim requires evidence sufficient to allow a reasonable jury to conclude that: (1) Mr. Taylor engaged in protected First Amendment activity; (2) Mr. Taylor suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the Retaliation Defendants' decision to take the allegedly retaliatory action. *Jones*, 27 F.4th at 1284. "The 'motivating factor' [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). "Suspicious

15

timing alone will rarely be sufficient to create a triable issue because suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Id.* (cleaned up).

If Mr. Taylor can establish his *prima facie* case, the burden then shifts to the Retaliation Defendants to rebut the claim by showing that the allegedly retaliatory action would have occurred regardless of the protected activity. *Id.* If the Retaliation Defendants can make that showing, the burden shifts back to Mr. Taylor to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

Mr. Taylor alleges that the Retaliation Defendants retaliated against him by, among other things, housing him in the D.O. Building, depriving him of access to his property, and denying his requests for water.[4] *See, e.g.*, dkt. 124-1 at 47–53. In their summary-judgment motion, the Retaliation Defendants argue that no designated evidence supports a reasonable inference that Mr. Taylor's protected speech motivated the allegedly retaliatory acts and, regardless, the allegedly retaliatory acts would have been taken even if he had not engaged in protected speech. Dkt. 128 at 19–22.

---

[4] Mr. Taylor's complaint and portions of his deposition testimony can be read to suggest that he is also claiming that he was retaliated against because of his physical altercation with Officer Rosales. *See, e.g.*, dkt. 124-1 at 52 ("[H]e wouldn't assist me because they wanted to retaliate against me for that altercation with the officer."). To the extent Mr. Taylor pursues such claims, the Retaliation Defendants are entitled to summary judgment on them because getting into a physical altercation with a correctional officer and spraying him with pepper spray is not First Amendment protected speech. *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.").

16

In his response, Mr. Taylor does not designate evidence that would create a triable issue of fact as to whether his protected First Amendment activity motivated Defendants to place him in the D.O. Building and the conditions he experienced there. Mr. Taylor points the Court to an affidavit he signed on December 20, 2019, as evidence to support his retaliation claim. Dkt. 137 at 13 (citing dkt. 2-1 at 12–17)). In that affidavit, he complained about allegedly retaliatory actions that occurred on December 13 through 16, 2019, and contends that he was being retaliated against for grievances he had previously filed. Dkt. 2-1 at 12–17. But the affidavit was signed 10 days before Mr. Taylor was moved to the D.O. Building, and his previous grievances were filed at some unspecified point before that. Standing alone, such a time lapse does not support an inference that his protected First Amendment activity was a motivating factor behind his transfer to the D.O. Building or the conditions he experienced there, particularly given the intervening act of his assault on Officer Rosales. *See Manuel*, 966 F.3d at 680–81 (standing alone, fact that inmate's cell was shaken down nine minutes after he engaged in First Amendment protected activity was insufficient to create triable issue of fact as to retaliation claim because another, non-retaliatory motive existed).

Accordingly, the State Defendants' motion for summary judgment is **granted** as to Mr. Taylor's retaliation claims against the Retaliation Defendants, and those claims are **dismissed**.

### B. Rehabilitation Act Claims

To prevail on his claim under § 504 of the Rehabilitation Act, Mr. Taylor must show that: (1) he is a qualified person (2) with a disability and (3) the IDOC denied him access to a program or activity solely because of his disability. *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022); *Jaros v. Ill. Dep't of Corrs.*, 684 F.3d 667, 672 (7th Cir. 2012); 29 U.S.C. § 794(a). The parties only dispute the third prong.  Dkt. 123 at 23–24.[5]

The Commissioner argues that Mr. Taylor has not designated evidence from which a reasonable jury could infer that he was denied access to a program or activity solely because of his disability. *Id.*[6] The Commissioner designates evidence showing that Mr. Taylor was held in segregation in the D.O. Building and denied access to programs and services because he (1) assaulted a correctional officer and was awaiting transfer; and (2) attempted to commit suicide, thereby necessitating restrictions on his activities. Dkt. 128 at 24 (citing evidence).

In response, Mr. Taylor does not designate evidence to the contrary. He attempts to analogize his case to *Jaros*, in which the Seventh Circuit concluded

---

[5] Mr. Taylor also must show that the IDOC accepts federal funds, 29 U.S.C. § 794(a), but the IDOC concedes this, dkt. 123 at 23–24.

[6] The Commissioner also argues that she is entitled to summary judgment on the basis of qualified immunity. *Id.* at 24. She's not. The Commissioner is sued in her official, rather than individual, capacity and qualified immunity does not apply to official-capacity claims. *Wagoner v. Lemmon*, 778 F.3d 586, 589–90 (7th Cir. 2015) (holding qualified immunity does not apply to official-capacity claim brought against the IDOC commissioner).

that a plaintiff had stated a claim under the Rehabilitation Act by alleging that he was denied access to a work release program solely because medical staff placed a medical hold on his file because he used a cane. Dkt. 137 at 14 (citing 684 F.3d 667). But he does not designate any evidence that would allow a reasonable jury to conclude that he was denied access to programs and services because he had been placed on a medical hold like the plaintiff in *Jaros*. Mr. Taylor also points the Court to its Order reconsidering its initial Screening Order and allowing him to proceed with a Rehabilitation Act Claim. *Id.* The fact that the Court allowed Mr. Taylor to pursue a Rehabilitation Act claim is not evidence showing that there is a genuine dispute of material fact as to the claim.

Moreover, the Rehabilitation Act does not prevent the IDOC from restricting Mr. Taylor's access to programs and services based on behavior suggesting that he is a threat to himself or others, even if that behavior is arguably caused by his disabilities. *See Felix v. Wis. Dept. of Trans.*, 828 F.3d 560, 573–74 (7th Cir. 2016) (affirming grant of summary judgment to employer on Rehabilitation Act claim where undisputed facts established that employer terminated employee's employment because her behavior demonstrated that she was a threat to herself and others, even though the behavior was arguably precipitated by her disabilities); *cf. Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485–86 (7th Cir. 2019) (reversing grant of summary judgment on Rehabilitation Act claim where defendants claimed plaintiff was placed in a

19

seclusion room in part because she began screaming when they tried to take her back to her room but plaintiff disputed that fact).[7]

Accordingly, the State Defendants' motion for summary judgment is **granted** as to Mr. Taylor's Rehabilitation Act claims against Commissioner Reagle, and those claims are **dismissed**.

### C. Eighth Amendment Medical Claims

Mr. Taylor alleges that the Medical-Care Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (cleaned up). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–728 (7th Cir. 2016) (en banc).

The Medical-Care Defendants do not dispute that Mr. Taylor's mental illnesses were serious medical conditions. *See generally* dkts. 125 and 128. Thus, the issue is whether there is evidence from which a reasonable jury could

---

[7] To the extent that Mr. Taylor is attempting to raise a claim about his medical care under the Rehabilitation Act, that attempt fails because it is undisputed that he received medical care, even though he believes that care was inadequate. The Rehabilitation Act does not create a remedy for medical malpractice. *Reed*, 915 F.3d at 486 n.6.

conclude that the Medical-Care Defendants were deliberately indifferent to Mr. Taylor's medical needs.

"A prison official is deliberately indifferent only if he knows of and disregards an excessive risk to inmate health or safety." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (cleaned up). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728. A court should "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728.

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). A finding of deliberate indifference may be based on evidence that a physician "persist[ed] with a course of treatment that he [knew would] be ineffective," as well as evidence that a physician's "treatment decision that is so far afield of accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (cleaned up). But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Dean*, 18 F.4th at 241–42.

### 1. Dr. LaMar

Dr. LaMar argues that she was not deliberately indifferent to Mr. Taylor's serious medical needs because she placed him on suicide watch and Mr. Taylor is not entitled to demand out-of-cell visits or other specific care. Dkt. 125 at 2, 17. In response, Mr. Taylor argues that Dr. LaMar was deliberately indifferent to his serious medical needs because she persisted with a course of treatment that she knew to be inadequate—suicide watch and cell-front visits—rather than referring him to psychiatry, or doing a psychological evaluation. Dkt. 137 at 5. He also alleges that she violated unspecified "policy and protocol and did not use the gradual step-down process and place plaintiff on 'close observation'" after suicide watch was discontinued. *Id.*

As evidence that Dr. LaMar's treatment was inadequate, he points the Court to a 2016 settlement agreement that the IDOC entered into in an earlier-filed class-action case under which the IDOC and its medical contractors were required to provide certain levels of care for inmates found to be seriously mentally ill. *Id.* (citing dkt. 135-1 at 6–30); *see also Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, IDOC*, No. 1:08-cv-1317-TWP-MJD, dkt. 496 (S.D. Ind. Jan. 27, 2016). In reply, Dr. LaMar argues that a violation of policy is not a constitutional violation, and, in any event, Mr. Taylor has not shown that he is covered by the settlement agreement. Dkt. 145 at 3, 5.

No reasonable jury could conclude that Dr. LaMar was deliberately indifferent to Mr. Taylor's serious medical needs. The designated evidence shows that Dr. LaMar saw Mr. Taylor multiple times during his stay in the D.O.

Building, placed him on suicide watch after he tried to hang himself, and ensured that he received a suicide companion. Mr. Taylor has not designated any evidence from which a reasonable jury could infer that this course of treatment was "so far afield of accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal*, 851 F.3d at 724 (cleaned up). Neither has he designated any evidence that Dr. LaMar knew that she was persisting with a course of treatment that was ineffective. On the contrary, Mr. Taylor admitted at his deposition that being placed on suicide watch was helpful to him. The fact that Mr. Taylor believes that Dr. LaMar's treatment was ineffective or disagrees with her chosen course of treatment is insufficient to avoid summary judgment. *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021).

Mr. Taylor's citation to the settlement agreement from the other case does not create a genuine issue of material fact as to whether Dr. LaMar was deliberately indifferent. Violation of a policy may constitute evidence of a defendant's state of mind. *See, e.g.*, *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009). Although the settlement agreement requires certain treatment for "seriously mentally ill" inmates, s*ee generally* dkt. 135-1 at 6–30, Mr. Taylor has designated no evidence that Dr. LaMar knew about it. Moreover, even if she did, Mr. Taylor has not shown that the settlement agreement applies to him. Determining whether Mr. Taylor fits within the agreement's definition of "seriously mentally ill" would require medical opinions that Mr. Taylor is not qualified to give and supporting evidence that he has not designated. *See, e.g.*, dkt. 135-1 at 10 (emphasis added) (including in the definition of "seriously

23

mental ill" inmates who have: (1) made a "serious suicide attempt that *mental health staff considers serious*, inflicted self-injury that *mental health staff considers serious*, or both"; or (2)   "demonstrated a *pervasive* pattern of dysfunctional or disruptive social interactions, bizarre or disruptive behavior, *etc.*, *as a result of mental illness*").

Mr. Taylor also claims that Dr. LaMar violated "policy and protocol," but he does not designate any evidence identifying an applicable policy or protocol.

Accordingly, the Medical Defendants' motion for summary judgment is **granted** as to Mr. Taylor's medical-care claims against Dr. LaMar, and those claims are **dismissed**.

### 2. Dr. Gray

Dr. Gray argues that he was not deliberately indifferent to Mr. Taylor's serious medical needs because he acted reasonably after Mr. Taylor reported that he had a weapon in his cell. Dkt.  125 at 18. Mr. Taylor responds that Dr. Gray knew that Mr. Taylor had a razor on January 14, 2020, and planned to use it to commit suicide, but failed to place Mr. Taylor on suicide watch. Dkt. 137 at 6. He also contends that Dr. Gray violated an unspecified "policy or protocol" and did not conduct an "evaluation of suicide risk" or do a "suicide screening." *Id.*

Mr. Taylor has not designated evidence supporting a reasonable inference that Dr. Gray was deliberately indifferent to his serious medical needs. The designated evidence shows that after Mr. Taylor told Dr. Gray that he was suicidal and had a razor hidden in his cell that he planned to use to commit suicide, Dr. Gray told custody staff about the razor and was told that Mr. Taylor's

24

cell would be searched. Mr. Taylor has not designated any evidence that this course of treatment was "so far afield of accepted professional standards that a jury could find it was not the product of medical judgment." *Cesal*, 851 F.3d at 724 (cleaned up). To the extent that Mr. Taylor relies on violations of unspecified "policies or protocols" to support his claim against Dr. Gray, he has not pointed the Court to any specific policy or protocol that Dr. Gray allegedly violated or designated any evidence suggesting that he was covered by such policy or protocol.

Accordingly, the Medical Defendants' motion for summary judgment is **granted** as to Mr. Taylor's medical-care claims against Dr. Gray, and those claims are **dismissed**.

### 3. Wexford

Mr. Taylor is proceeding against Wexford under the theory set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). To prevail, Mr. Taylor must show that he was deprived of constitutionally adequate medical care as a direct result of a Wexford policy or custom and that Wexford "took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean*, 18 F.4th at 236.

Mr. Taylor's claim against Wexford alleges that it had widespread unwritten customs of improperly housing inmates in holding cells while on suicide watch and denying adequate mental health treatment to inmates with serious mental illness. Dkt. 1 at 44; dkt. 124-1 at 94-98; dkt. 137 at 7.

These *Monell* claims against Wexford fail because Mr. Taylor has not designated evidence showing how other inmates who attempted suicide were treated or that they were denied adequate mental health treatment. To prevail on an unlawful custom claim, the plaintiff must show numerous and widespread instances of unconstitutional conduct; evidence of how the plaintiff was treated, without more, is insufficient. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (plaintiff did not provide sufficient evidence of widespread and numerous treatment delays, as the evidence merely showed three instances of delays involving only the plaintiff).

Accordingly, Wexford's motion for summary judgment is **granted**, and Mr. Taylor's claims against it are **dismissed**.

### 4. State Defendants

In his summary-judgment response brief, Mr. Taylor contends that Captain Rattan, Captain Rinehart, Lieutenant Ernest, and Officer Gray were deliberately indifferent to his serious medical needs because they knew the water did not work in his cell. Dkt. 137 at 8. Mr. Taylor has not designated any evidence supporting a reasonable inference that the lack of water in his cell caused him to suffer from an objectively serious medical condition to which these defendants were deliberately indifferent. This claim is more properly framed as a conditions-of-confinement claim and is addressed in that context below.

Mr. Taylor also contends that Captain Rattan, Lieutenant Ernest, and Officer Gray were deliberately indifferent to his serious medical needs on January 14, 2020, when they observed that he had cut his arm, was bleeding,

26

and was having a psychotic episode, as evidenced by the fact that he was writing and drawing with feces on the wall. *Id.* Despite these observations and the fact that Mr. Taylor asked for medical treatment, they did not even attempt to obtain any such treatment. *Id.*

In reply, Captain Rattan, Lieutenant Ernest, and Officer Gray argue that those allegations do not constitute deliberate indifference because Mr. Taylor had been seen by Dr. Gray earlier in the day; he was not on suicide watch at the time he cut himself; and the cuts were not severe. Dkt. 144 at 4. But they offer no explanation for their failure to obtain medical help for his psychotic episode. Mr. Taylor has designated evidence showing that they knew that he tried to commit suicide about two weeks before this incident, had cut himself with a razor, was writing and drawing with feces on the wall, and was asking for medical treatment. From these facts, a jury could reasonably infer they knew that Mr. Taylor needed mental health assistance and that doing nothing would leave Mr. Taylor in an untreated psychotic state that could result in further risk of harm to himself or others. As a result, they are not entitled to summary judgment on Mr. Taylor's medical-care claims against them.

Accordingly, the State Defendants' motion for summary judgment is **granted** as to Mr. Taylor's Eighth Amendment medical-care claim against Captain Rinehart, and that claim is **dismissed**. The motion is **denied** as to his medical-care claim against Captain Rattan, Lieutenant Ernest, and Officer Gray.

### D. Eighth Amendment Conditions-of-Confinement Claims

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the Defendants "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is . . . enough." *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

### 1. State Defendants

Mr. Taylor brings conditions-of-confinement claims against Warden Zatecky, Captain Mason, Officer Carter, Lieutenant Ernest, Officer Gross, Captain Rinehart, Aaron Smith, Captain Rattan, Lieutenant Davis, and Officer Gray. The State Defendants argue Mr. Taylor cannot show that he experienced conditions that were objectively serious and exposed him to an excessive risk to his health and safety.

28

Mr. Taylor alleges that his conditions of confinement violated the Eighth Amendment because, over the 19 days he was housed in the D.O. Building, he was denied recreation time, went for days without a shower, was denied water, and was exposed to extreme cold. *E.g.*, dkt. 137 at 8–9. As to the temperature, a jury could find from the designated evidence that the cold created an excessive risk to Mr. Taylor's safety because he was not supplied ample clothing or blankets to keep warm in those conditions. *Cf. Murphy v. Walker*, 51 F.3d 714, 720–21 (7th Cir. 1995) (holding that pretrial detainee stated a conditions-of-confinement claim where he alleged that he was confined to a cold cell without clothes and heat for 10 days in the middle of November in Illinois); *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997) (explaining that, in cases alleging constitutional violations based on cold, the question is not whether the inmate had some alternative means for warmth, but whether the alternative was adequate to combat the cold).

The principal case relied on by State Defendants, *Mays*, 575 F.3d at 648–49, is unavailing. There, an inmate alleged that because he did not receive adequate clothing in the winter months, he suffered physical injuries such as frostbite. The Seventh Circuit held that his conditions did not rise to the level of objectively serious harm to show an Eighth Amendment violation because he "did not show that he was forced to be in the cold for long periods of time or that he suffered anything more than the usual discomforts of winter." *Id.* But Mr. Taylor has designated evidence that he was forced to remain in a cold cell without adequate clothing for at least eight consecutive days while subjected to extreme

cold. The State Defendants also note that Mr. Taylor was repeatedly observed by his suicide companion to be sleeping under covers, dkt. 128 at 15, but such evidence at best creates a credibility issue as to whether Mr. Taylor had adequate protection against the cold, which the Court cannot resolve at summary judgment.

Genuine issues of material fact about whether the cold in Mr. Taylor's cell was objectively serious prevent the Court from entering summary judgment in the State Defendants' favor on Mr. Taylor's conditions-of-confinement claims. In making this ruling, the Court does not reach the question of whether the other conditions about which Mr. Taylor complains—*e.g.*, infrequent showers and lack of access to personal belongings—were objectively serious under the first prong of the conditions-of-confinement analysis. In some cases, conditions can combine to be objectively serious when each alone would not be. *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). Mr. Taylor contends that the conditions in his cell combined to be objectively serious, *see, e.g.*, dkt. 137 at 10, but the State Defendants did not address that contention, instead limiting their discussion to showing that the conditions were not objectively serious when considered individually, dkt. 128 at 15–17.

Because there are disputed factual issues as to whether Mr. Taylor's conditions of confinement were objectively serious, the Court turns to the subjective component of the conditions of confinement claim. The State Defendants do not present any argument that would entitle them to summary judgment on the basis that they were not subjectively aware of the conditions.

30

*See* dkt. 128 at 13–17.  While the State Defendants accurately recite the legal standard that Mr. Taylor must satisfy to win on this aspect of his claim, they do not cite any evidence of their own, *e.g.*, declarations that they were not aware of certain conditions and/or corresponding risks.  As the party seeking summary judgment, the State Defendants are obligated to set forth factual support for their motion.   S.D. Ind. L.R. 56-1(a) (movant's obligations); (e) (citations to supporting facts).  By not doing so, the burden did not shift to Mr. Taylor to designate evidence as to the subjective component. *See Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim. The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts of authority pertaining to the strip search, the defendants sought summary judgment on all claims against all parties.").  The State Defendants have not designated evidence showing that they were not aware that Mr. Taylor was forced to remain in a cold cell without adequate clothing for at least eight consecutive days while subjected to extreme cold or that they took steps to remedy that situation.

Accordingly, the State Defendants' motion for summary judgment is **denied** as to Mr. Taylor's conditions-of-confinement claims against Warden Zatecky, Captain Mason, Officer Carter, Lieutenant Ernest, Officer Gross,

Captain Rinehart, Mr. Smith, Captain Rattan, Lieutenant Davis, and Officer Gray.

### 2. Dr. LaMar

Dr. LaMar argues she is entitled to summary judgment on Mr. Taylor's conditions-of-confinement claims because she did not ignore a known risk of harm to Mr. Taylor. Specifically, she argues: (1) Mr. Taylor complained to her about the cold in his cell on only one occasion, dkt. 125 at 19 (citing dkt. 124-4 at 19); (2) Mr. Taylor complained to her about problems with the water in his cell on only one occasion, *id.* at 20 (citing dkt. 124-4 at 28); (3) she was not responsible for ensuring that Mr. Taylor received showers, he received a shower two days after he first raised the issue to her on December 30, 2019, and when he raised the issue again on January 3, 2020, she told custody staff and they refuted his claims, *id.* at 21 (citing dkt. 124-4 at 28; dkt. 125); (4) when Mr. Taylor told her he was not eating because he feared that his food was being contaminated, she told custody staff, and they told her that Mr. Taylor had been seen eating some meals, *id.* at 21–22 (citing dkt. 124-4 at 28); (5) she discussed Mr. Taylor's requests for access to his property with custody staff, after which he received some of the materials he requested, *id.* at 22 (citing dkt. 124-4 at 37, 40); and (6) she did not have the authority to change his cell assignment, *id.* at 22 (citing 124-3 at § 8). Mr. Taylor responds that he informed Dr. LaMar about "the inhumane conditions of confinement and harsh restrictions he was being subjected to" and that Dr. LaMar "had the authority to request that [he] be removed from the holding cell." Dkt. 137 at 6–7.

Based on the designated evidence, no reasonable jury could conclude that Dr. LaMar knew of and ignored a serious risk to Mr. Taylor's health or safety. Dr. LaMar has designated evidence showing that Mr. Taylor complained to her about the cold and water issues only once, and Mr. Taylor has not designated any evidence from which a reasonable jury could conclude that Dr. LaMar was aware of an ongoing risk to Mr. Taylor from either of these problems. Dkt. 137 at 6–7. As to the other conditions (inadequate showers, problems with food, and access to property), Dr. LaMar has designated evidence that she raised Mr. Taylor's concerns with custody staff and the concerns were addressed or custody staff told her that Mr. Taylor's complaints were inaccurate. Mr. Taylor has not designated any evidence from which a reasonable jury could conclude that Dr. LaMar knew about and ignored an ongoing risk to Mr. Taylor in connection with those issues.

As to the Mr. Taylor's ongoing placement in a holding cell in the D.O. Building, Dr. LaMar has testified that she could not change his cell assignment, and Mr. Taylor has not designated any evidence from which a reasonable jury could conclude to the contrary.[8] Finally, Mr. Taylor does not point the Court to any evidence showing that Dr. LaMar was aware of any other specific allegedly unconstitutional conditions of confinement or that Mr. Taylor had complaints

---

[8] Mr. Taylor does cite to the settlement agreement discussed above and documents showing that Wexford agreed to abide by the settlement agreement, but, as explained, he fails to show that he was covered by the settlement agreement or to point the Court to specific language showing that Dr. LaMar had the authority to change his cell assignment.

about them. *Id.* Mr. Taylor bears the burden of identifying record evidence that demonstrates a genuine issue of material fact as whether Dr. LaMar was subjectively aware of an objectively serious threat to Mr. Taylor's health and safety and disregarded that threat. He has failed to do so.[9]

Accordingly, the Medical Defendants' motion for summary judgment is **granted** as to Mr. Taylor's conditions-of-confinement claims against Dr. LaMar, and those claims are **dismissed**.

### 3. Dr. Gray

Dr. Gray argues he is entitled to summary judgment because Mr. Taylor has not designated evidence showing that he was aware of the issues with temperature, fluctuating water pressure, lack of showers, and food tampering. Dkt. 125 at 19–23. As to Mr. Taylor's complaint about being deprived of his personal property, he contends that he discussed Mr. Taylor's request for a pen with custody staff, who provided a pen. *Id.* at 22. Finally, as to Mr. Taylor's complaint about his continuing placement in the D.O. Building, Dr. Gray argues that he did not have the authority to make or change a cell assignment for Mr. Taylor. *Id.* Mr. Taylor responds that he informed Dr. Gray about "the inhumane conditions of confinement and harsh restrictions he was being subjected to" and that Dr. Gray "had the authority to request that [he] be removed from the holding cell." Dkt. 137 at 6–7.

---

[9] In this section of his response brief, Mr. Taylor also argues that Dr. LaMar failed to offer him necessary mental health treatment. Dkt. 137 at 6. The Court has addressed contentions about mental health treatment in connection with Mr. Taylor's medical-care claim.

But Dr. Gray has testified that he did not have the authority to change Mr. Taylor's cell assignment, dkt. 124-2 ¶ 8, and Mr. Taylor does not cite any evidence from which a reasonable jury could find that Dr. Gray had such authority, dkt. 137 at 6–7.[10] Likewise, Dr. Gray designated evidence showing that he addressed Mr. Taylor's complaint about not having a pen, dkt. 124-4 at 43, and Mr. Taylor does not designate any evidence from which a reasonable jury could conclude that Dr. Gray ignored the complaint, dkt. 137 at 6–7. Moreover, Mr. Taylor has not designated evidence from which a reasonable jury could conclude that Dr. Gray was aware of Mr. Taylor's complaints about temperature, water pressure, lack of showers, and food tampering. Dkt. 125 at 19–23. Finally, Mr. Taylor does not point the Court to any evidence showing that Dr. Gray was aware of any other specific allegedly unconstitutional conditions of confinement or that Mr. Taylor was complaining about those conditions. *Id.* Mr. Taylor bears the burden of identifying record evidence that demonstrates a genuine issue of material fact as whether Dr. Gray was subjectively aware of an objectively serious threat to Mr. Taylor's health and safety and disregarded that threat. He has failed to do so.[11]

---

[10] Mr. Taylor again cites to the settlement agreement discussed above and documents showing that Wexford agreed to abide by the settlement agreement, but his reliance on those documents fails for the same reasons discussed in note 9, *supra.*

[11] In this section of his response brief, Mr. Taylor also argues that Dr. Gray failed to offer him necessary mental health services. Dkt. 137 at 6. The Court has addressed that contention in connection with Mr. Taylor's medical-care claims.

Accordingly, the Medical Defendants' motion for summary judgment is **granted** as to Mr. Taylor's conditions-of-confinement claims against Dr. Gray, and those claims are **dismissed**.

### E. Failure-to-Train Claims

Finally, Mr. Taylor contends that former Commissioner Carter and Warden Zatecky violated the Eighth Amendment because they failed to adequately train custody staff about "how to properly manage, interact, and identify inmates['] mental health deterioration (the non-existence of a training program or policy) and/or failure to properly implement the policy and training." Dkt. 137 at 12. Mr. Taylor's failure-to-train claims against former-Commissioner Carter and Warden Zatecky fail because "failure to train claims are usually maintained against municipalities [or corporations], not against individuals, and, in the Eighth Amendment context, such claims may only be maintained against a municipality [or corporation]." *Brown v. Budz*, 398 F.3d 904, 918 (7th Cir. 2005) (quoting *Sanville v. McCaughtry,* 266 F.3d 724, 739–40 (7th Cir. 2001)). Moreover, to sustain his claims against Commissioner Carter and Warden Zatecky, Mr. Taylor must designate evidence from which a reasonable jury could infer that they knew their failure to train or supervise was likely to lead to constitutional violations. *Ghashiyah v. Frank*, No. 07-C-308-C, 2007 WL 5517455, at *2 (W.D. Wis. Aug. 1, 2007) (citing *Kitzman–Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000), and *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)) ("Supervisors may be liable under § 1983 for a failure to train, but the circumstances are extremely limited . . . . [T]he plaintiff must show that the

36

defendant knew that his failure to train was likely to lead to constitutional violations."). He has not designated any such evidence.

Accordingly, the State Defendants' motion for summary-judgment is **granted** as to Mr. Taylor's Eighth Amendment failure-to-train claims against former-Commissioner Carter and Warden Zatecky.

### IV.
### Conclusion

For the reasons stated above, the Medical Defendants' motion for summary judgment, dkt. [124], is **granted**.

The State Defendants' motion for summary judgment, dkt. [127], is **granted** as to: (1) Mr. Taylor's First Amendment retaliation claims against the Retaliation Defendants; (2) his Rehabilitation Act claims against Commissioner Reagle; (3) his Eighth Amendment medical-care claims against Captain Rinehart; and (4) his Eighth Amendment failure-to-train claims against former Commissioner Carter and Warden Zatecky. It is **denied** as to his Eighth Amendment medical-care claims against Captain Rattan, Lieutenant Ernest, and Officer Gray; and (2) his Eighth Amendment conditions-of-confinement claims against Warden Zatecky, Captain Mason, Officer Carter, Lieutenant Ernest, Officer Gross, Captain Rinehart, Aaron Smith, Captain Rattan, Lieutenant Davis, and Officer Gray.

Because some of Mr. Taylor's claims have survived summary judgment, final judgment will not enter at this time.

The **clerk is directed** to add IDOC Commissioner Christina Reagle, in her official capacity, as a defendant on the docket, and then terminate her as a

defendant in the case. The **clerk is also directed** to update the docket to reflect that the proper name of the defendants as follows:

- Captain Mason's proper name is Davis Mason
- Captain Rinheart's proper name is Charles Rinehart
- Captain Rattin's proper name is Jeremy Rattan
- Davis's proper name is Justin Davis
- Earnest's proper name is Jason Ernest
- Officer Grey's proper name is Leslie Gray
- Officer Carter's proper name is Nicole Carter
- Officer Gross's proper name is Rachael Gross
- Dr. Lamar's proper name is Akilah LaMar
- Dr. Grey's proper name is Michael Gray

The **clerk is also directed** to terminate the following parties as defendants on the docket: (1) Robert E. Carter, Jr.; (2) Michael Gray; (3) Wexford of Indiana, LLC; and (4) Akilah LaMar.

Mr. Taylor's remaining claims will be resolved by settlement or trial. The Court *sua sponte* reconsiders its October 20, 2021, Order denying without prejudice Mr. Taylor's motion for assistance with recruiting counsel, dkt. [85], and **grants** his request to the extent that the Court will attempt to recruit counsel to represent him. The parties will be notified once counsel has been recruited.

**SO ORDERED.**

Date: 3/28/2023

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

38

Distribution:

QUENTIN L. TAYLOR
178973
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Marley Genele Hancock
CASSIDAY SCHADE LLP
mhancock@cassiday.com

Joseph A. Panatera
CASSIDAY SCHADE LLP
jpanatera@cassiday.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com